# UNITED STATES DISTRICT COURT

for the

Middle District of North Carolina

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>A red 2005 Dodge Ram 1500 pickup truck bearing North<br>Carolina license plate number PEC-2320 and vehicle<br>identification number 1D7HA18DX5S17268 | )<br>)<br>)<br>)<br>)    Case No. 1:19mj 320 |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:
See Attachment A.

located in the _____ Middle _____ District of _____ North Carolina _____ , there is now concealed *(identify the person or describe the property to be seized)*:
See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. Section 841(a)(1);<br>18 U.S.C. Section 924(c) | Distribution of 5 grams or more of methamphetamine, its salts, isomers, and salts<br>of its isomers, a Schedule II controlled substance; possess/carry and use a firearm<br>in furtherance of/during and in relation to a drug trafficking crime |

The application is based on these facts:
See attached Affidavit.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested
under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Reviewed by AUSA/SAUSA:

Randall S. Galyon

*Applicant's signature*

Michael L. Jordan, Special Agent

*Printed name and title*

Sworn to before me and signed in my presence.

Date: 09/25/19

*Judge's signature*

City and state: Greensboro, North Carolina

L. PATRICK AULD, U.S. MAGISTRATE JUDGE

*Printed name and title*

*Place to be searched*

The property to be searched is listed below:

**2005 Dodge Ram 1500 pickup truck bearing North Carolina license plate number PEC-2320 and vehicle identification number 1D7HA18DX5S172681308**

This vehicle is described as a red in color pickup truck. This search warrant requests permission to search any safes located in TARGET VEHICLE 1.

## ATTACHMENT B

### *Items to be Seized*

The items to be seized are fruits, evidence, records and information relating to, contraband, or instrumentalities of violations of Title 21, United States Code, Sections 841(a)(1) (distribution and possession with intent to distribute methamphetamine and other controlled substances) and Title 18, United States Code, Section 924(c) (possessing a firearm in furtherance of a drug trafficking crime):

a. Indicia of distribution, records and documents, receipts, notes ledgers and other papers including any computerized or electronic records including cellular telephones, relating to the ordering, purchase or possession of controlled substances and/or firearms;

b. U.S. currency and other illicit gains from the distribution of controlled substances and/or firearms;

c. Address and/or telephone books and papers, including computerized or electronic address and/or telephone records reflecting names, addresses and/or telephone numbers;

d. Books, records, receipts, bank statements, and records, money drafts, and any other items evidencing the obtaining, secreting, transfer, concealment, storage and/or expenditure of money or other assets including, but not limited to, controlled substances and/or firearms;

e. Documents and papers evidencing ownership of proceeds from the sale of controlled substances and/or firearms, storage and location of such assets and facilities to safely store and secure such items, such as safes, to include lock boxes, and strong boxes;

f.   Photographs, in particular, photographs of controlled substances and/or firearms and photographs of individuals possessing controlled substances and/or firearms and photographs showing the association of individuals;

g.   Indicia of occupancy, residence, and/or ownership of the premises described herein, including, but not limited to, utility and telephone bills, cancelled envelopes, and keys;

h.   Cellular phones, computers, and other electronic storage media or digital devices;

i.   For any electronics searched, any conversations, whether through text messages or other applications, discussing the purchase and sale of methamphetamine, cocaine, other controlled substances, and/or firearms;

j.   For any electronics searched, any photographs of controlled substances and/or firearms.

For any computer or storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

a.   evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

b.   evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c.   evidence of the lack of such malicious software;

d.   evidence indicating the computer user's state of mind as it relates to the crime under investigation, such as internet searches indicating criminal planning, or running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement;

e.   evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

f.   evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

g.   passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

h.   documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

i.   records of or information about Internet Protocol addresses used by the COMPUTER;

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, including "smart" phones, tablets, server computers, and network hardware.

The term "storage medium" includes any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

During the execution of the search of TARGET VEHICLE 1 described in Attachment A, law enforcement personnel are authorized to press the fingers (including thumbs) or obtain facial recognition of FLAVIO LOPEZ GARCIA and BRIANNA CHANTEL KENNEDY found in TARGET VEHICLE 1 to the Touch ID / Face ID sensor of cellular phones found in TARGET VEHICLE 1 for the purpose of attempting to unlock the device via Touch ID or facial recognition in order to search the contents as authorized by this warrant.

NOTE: Any wireless or cellular telephones shall be searched for the information set forth in this Attachment including recent calls, contact lists, stored text messages, emails, and any other stored files or data.

## AFFIDAVIT IN SUPPORT OF AN
## APPLICATION UNDER RULE 41
## FOR A WARRANT TO SEARCH AND
## SEIZE

I, Michael Jordan, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.     I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant for a residence located at 308 Lowdermilk Street, Greensboro, NC 27401 (hereinafter, "TARGET PREMISES") and a search warrant for two vehicles, a 2005 Dodge Ram 1500 pickup truck bearing North Carolina license plate number PEC-2320 and vehicle identification number 1D7HA18DX5S17268 (hereinafter, "TARGET VEHICLE 1") and a gray 2014 Nissan Altima automobile bearing North Carolina license plate number FLS-1855 and vehicle identification number 1N4AL3AP0EN364363 (hereinafter, "TARGET VEHICLE 2"), all of which are within the Middle District of North Carolina and further described in Attachment A, for the things described in Attachment B.

2.     As explained further herein, FLAVIO LOPEZ GARCIA (hereinafter, "GARCIA") distributed 5 grams or more of methamphetamine, its salts, isomers, and salts of its isomers, a Schedule II controlled substance, in violation of Title 21, United States Code, Section 841(a)(1), and

possessed/carried and used a firearm in furtherance of/in relation to a drug trafficking crime, in violation of Title 18, United States Code, Section 924(c), within the Eastern District of Virginia, which he trafficked from the Middle District of North Carolina.

3. I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), and have been since June 12, 2018. Prior to my appointment with the ATF, I was a sworn law enforcement officer in the Commonwealth of Virginia for over thirteen years, the last six of which I was assigned to the Special Investigations Bureau, Street Crimes Unit. I am currently assigned to the ATF Falls Church Group II Field Office, an enforcement group responsible for investigating violent crime, gangs, armed drug trafficking, and other firearm related violations. In my capacity as a law enforcement officer, I have investigated individuals for the illegal possession and use of firearms, illegal possession and distribution of controlled substances, and for commission of violent crimes. Many of these investigations involved the execution of search warrants, and led to the arrest and conviction of individuals for violations of state laws.

4. During my time as a law enforcement officer, I have become knowledgeable about the methods and modes of narcotics operations, and the language and patterns of drug use and trafficking. I have gained knowledge

2

in the use of various investigative techniques including the use of wiretaps, physical surveillance, undercover agents, confidential informants and cooperating witnesses, the controlled purchases of illegal narcotics, the trafficking of firearms, electronic surveillance, consensually monitored recordings, investigative interviews, financial investigations, the service of Grand Jury Subpoenas, and the execution of search and arrest warrants.

5.      Based on my training and experience, I know that individuals involved in criminal activities will often communicate with their associates before, during, or after the crime by using cellular telephones and that communication can be made through either verbal conversation, third party communication applications, or through the use of text messages between the two communicating parties' cellular telephones or other devices. It is also commonly understood and known that many people in our society communicate with their cellular telephones and other devices in both manners.

6.      Based on my training and experience, I also know that information gained through the obtaining of data stored in the cellular telephone and other devices routinely referred to as an address book or contacts file in an individual's cellular telephone and other devices, as well as the recovery of text messages sent or received from that cellular telephone

3

and other devices can lead to identifying accomplices, or witnesses to the crimes committed by the individual. Based on my training experience, I also know that know that individuals frequently maintain personal records and documents in an electronic format on laptop computers and/or smart phones.

7. Based on my training and experience, I also know that distributors of controlled substances and/or firearms will utilize vehicles to move, store, and conceal their controlled substances and/or firearms proceeds from law enforcement and the theft of others. These vehicles may have "traps" or other concealment methods within the vehicle or attached to the vehicle.

8. Further, based on my training and experience in executing court-authorized search warrants, I also know that drug traffickers commonly maintain at their residences and on their property additional quantities of the illicit drugs being distributed. These drugs may be concealed in locations known to the traffickers to avoid law enforcement detection. Drug traffickers also commonly maintain at their residences and on their property paraphernalia for packaging, processing, diluting, weighing and distributing controlled substances.

9. Based on my training and experience in executing court-authorized search warrants, I also know that drug and/or firearm traffickers

4

commonly maintain at their residences money ledgers and other documents,
which note the price, quantity, date and/or times when controlled substances
were purchased, possessed, transferred, distributed, sold or concealed, or
when money was possessed or transferred. Drug and/or firearm traffickers
also often maintain the proceeds of their narcotics transactions at their
residences.

10.    The facts and information contained in this affidavit are based
upon my personal knowledge of the investigation and observations of other
law enforcement officers involved in this investigation. All observations not
personally made by me were relayed to me by the individuals who made them
or are based on my review of reports, documents, and other physical evidence
obtained during the course of this investigation.

11.    This affidavit is intended to show only that there is sufficient
probable cause for the requested warrant and does not set forth all of my
knowledge about this matter.

### Background on the Investigation

12.    In or about June 2019, a confidential informant ("CI") reported to
Prince William County Police ("PWCPD") and ATF that GARCIA is an armed
narcotics and firearm distributor, who resides in North Carolina, but who is
willing to distribute in Prince William County, Virginia, within the Eastern

5

District of Virginia. The information provided by the CI about GARCIA regarding his locations, vehicles, and activities was corroborated by law enforcement and found to be credible.

13.    The CI advised law enforcement that he/she has conducted business with GARCIA, through a third party, for approximately two years. These transaction occurred while the CI was staying in North Carolina. During this time, the CI would buy various firearms and ounce levels of cocaine on a weekly basis. The CI advised that he/she would pay $1,100 per one ounce of cocaine, $600-$800 for rifles, and $200-$400 for handguns. In early 2019, the third party provided the CI with the contact phone number, (336) 988-3975, (hereinafter, "GARCIA TELEPHONE NUMBER") for GARCIA. The CI advised that GARCIA had previously driven to Virginia to meet the CI to discuss business. At the time of the meet, which occurred prior to the CI's cooperation with law enforcement, the CI advised that GARCIA was operating an older Dodge Ram pickup truck, red in color. The Dodge Ram pickup truck was later identified, by law enforcement, TARGET VEHICLE 1. The CI was directed by PWCPD and ATF to maintain contact with GARCIA to facilitate law enforcement directed purchases of narcotics and firearms.

6

14. Beginning in June 2019 and continuing to August 2019, law enforcement conducted numerous controlled purchases of firearms, cocaine, and methamphetamine from GARCIA, utilizing the aforementioned CI. These purchases from GARCIA resulted in law enforcement obtaining multiple firearms, approximately 57 grams of suspected cocaine, and approximately 143 grams of suspected methamphetamine.

15. Between about June 4, 2019 and June 11, 2019, the CI and GARCIA exchanged several phone calls and text messages via the GARCIA TELEPHONE NUMBER to set up a purchase of a firearm and narcotics. During the exchange of the text messages and phone calls, the CI was located in northern Virginia and GARCIA was believed to be in North Carolina. On or about June 11, 2019, the CI texted and spoke with GARCIA via the GARCIA TELEPHONE NUMBER, confirming the sale of a firearm and cocaine. On or about June 12, 2019, the CI texted and spoke with GARCIA via the GARCIA TELEPHONE NUMBER to confirm the aforementioned transaction.

16. On or about June 12, 2019, at the direction of ATF and the PWCPD, the CI conducted a controlled purchase of suspected cocaine and a firearm from GARCIA. This controlled purchase took place in the parking lot of the Courtyard by Marriott Hotel, located at 14300 Crossing Place,

7

Woodbridge, Virginia 22192 (hereinafter, "MARRIOTT HOTEL"). Prior to the controlled purchase, the CI, as well as the vehicle in which the CI would travel, were searched for any illegal or unauthorized items. No illegal items were found. The CI was provided several devices, which collectively record and transmit audio and location information. While waiting for GARCIA to arrive in the area, the CI received a call from GARCIA, advising that GARCIA was in the area and requesting the exact meet location. This conversation was recorded on the wire provided to the CI. After the phone conversation, the CI texted GARCIA the address of the MARRIOTT HOTEL. Shortly after receiving the text message, GARCIA arrived on scene. GARCIA was observed operating TARGET VEHICLE 2. During the controlled purchase, the CI provided money directly to GARCIA as payment for the firearm and narcotics, which were transferred from TARGET VEHCLE 2 to the CI's vehicle. GARCIA provided approximately 29 grams of suspected cocaine and one firearm to the CI. The firearm did not have a serial number. The suspected cocaine provided by GARCIA field tested positive for the presence of cocaine, and was submitted to the Drug Enforcement Administration (DEA) Mid Atlantic Laboratory in Largo, Maryland (hereinafter, "DEA LABORATORY") for further analysis.

17. After the transaction, law enforcement databases were checked for the registered owner of TARGET VEHICLE 2. TARGET VEHICLE 2 returned to a female by the name of Brianna Chantel Kennedy (hereinafter, "KENNEDY"), with a listed address of the TARGET PREMISES. A further check of law enforcement databases revealed that the aforementioned address was also listed as the residence for GARCIA. A background check of GARCIA revealed that in September of 2017, police in Greensboro, NC were dispatched for a complaint of individuals smoking marijuana in TARGET VEHICLE 1. GARCIA was located by police in the driver seat of TARGET VEHICLE 1. A check of law enforcement databases further revealed that TARGET VEHICLE 1 was registered to a Miram Hernandez of 88 Ash Forest Street, Kernersville, NC. A background check of Miram Hernandez revealed that she had a previous listed address of the TARGET PREMISES. Physical surveillance conducted by law enforcement observed TARGET VEHICLE 2 and TARGET VEHICLE 1 parked at the TARGET PREMISES, on multiple occasions.

18. At law enforcement direction, the CI was instructed to maintain contact with GARCIA in an attempt to arrange future purchases of firearms and narcotics. For numerous days prior to July 4, 2019, the CI exchanged several phone calls and text messages with GARCIA, to set up a purchase of

9

firearms and narcotics. Prior to the controlled buy, GARCIA instructed the CI to wire transfer $1000 to KENNEDY, as a down payment. Law enforcement agent did as instructed. On or about July 3, 2019, the CI texted and spoke with GARCIA and confirmed the sale of firearms, methamphetamine, and cocaine. Prior to the controlled buy, a search warrant was obtained for location data and Pen Register Trap & Trace ("PRTT") on the GARCIA TELEPHONE NUMBER. Subscriber information for the GARCIA TELEPHONE NUMBER, obtained by law enforcement, identified GARCIA as the user and financially liable party. The subscriber user address listed on the account was the TARGET PREMISES.

19. On or about July 4, 2019, at the direction of ATF and the PWCPD, the CI conducted a controlled purchase of suspected cocaine, methamphetamine, and firearms from GARCIA. I observed the phone associated with GARCIA travelling from the area of the TARGET PREMISES to the deal via pings coming from same, which indicated that this was GARCIA's route to the transaction with the CI. This controlled purchase took place in the parking lot of the MARRIOTT HOTEL. Prior to the controlled purchase, the CI, as well as the vehicle in which the CI would travel, were searched for any illegal or unauthorized items. No illegal items were found. The CI was provided several devices, which collectively record

10

and transmit audio and location information. GARCIA was observed arriving in the area of the meet location, operating TARGET VEHICLE 2. Prior to meeting the CI, GARCIA stopped in front of the Country Inn & Suites, located adjacent to the MARRIOTT HOTEL, where he dropped off a white female. The female was later identified by surveillance units as KENNEDY. During the controlled purchase, the CI provided money directly to GARCIA as payment for the firearms and narcotics. GARCIA provided the CI with approximately 28 grams of suspected cocaine, 30 grams of suspected methamphetamine, and 2 firearms. The firearms did not have serial numbers. The suspected cocaine and methamphetamine provided by GARCIA field tested positive for the respective substances, and were submitted to the DEA LABORATORY for further analysis. The substance in question was identified as Methamphetamine Hydrochloride, with a net weight of 27.8153 grams (plus or minus 0.0009 grams), a substance purity of 100% (plus or minus 4%) and an amount of pure substance of 27.8153 grams (plus or minus 1.0204 grams).

20. At law enforcement direction, the CI was instructed to maintain contact with GARCIA in an attempt to arrange future purchases of firearms and narcotics. For numerous days prior to July 12, 2019, the CI exchanged several phone calls and text messages with GARCIA to set up a purchase of

11

firearms and narcotics. Prior to the controlled buy, GARCIA instructed the CI to wire transfer $1000 to KENNEDY, as a down payment. Law enforcement agent did as instructed. On or about July 11, 2019, the CI texted and spoke with GARCIA and confirmed the sale of firearms and methamphetamine. On or about July 11, 2019, law enforcement travelled down to the area of Greensboro, NC for the purpose of physically surveilling GARCIA. Surveillance units observed TARGET VEHICLE 2 parked at the TARGET PREMISES. Surveillance units additionally observed GARCIA arriving on scene of the TARGET PREMISES while operating TARGET VEHICLE 1. GARCIA was observed entering the back door of the TARGET PREMISES. GARCIA advised the CI that evening that everything was arriving and that he was ready for the scheduled transaction with the CI. That same evening GARCIA was observed by surveillance unit operating TARGET VEHICLE 1. During that surveillance, the passenger in TARGET VEHICLE 1 exited TARGET VEHICLE 1 and made contact with the driver of another vehicle for a short period of time and then returned to TARGET VEHICLE 1. Based on my training and experience, this type of activity is consistent with narcotics dealing.

21. On or about July 12, 2019, at the direction of ATF and the PWCPD, the CI conducted a controlled purchase of suspected

12

methamphetamine and firearms from GARCIA. Law enforcement followed GARCIA from the area of North Carolina to the deal location in Virginia, utilizing both physical surveillance and pings from the GARCIA TELEPHONE NUMBER. GARCIA was observed leaving the TARGET PREMISES and travelling to the deal location in TARGET VEHICLE 2. This controlled purchase took place in the parking lot of the MARRIOTT HOTEL. Prior to the controlled purchase, the CI, as well as the vehicle in which the CI would travel, were searched for any illegal or unauthorized items. No illegal items were found. The CI was provided several devices, which collectively record and transmit audio and location information. GARCIA was observed by surveillance arriving on scene. During the controlled purchase, the CI provided money directly to GARCIA as payment for the firearms and narcotics. GARCIA provided the CI with approximately 56 grams of suspected methamphetamine and 3 firearms. The suspected methamphetamine provided by GARCIA field tested positive, and was submitted to the DEA LABORATORY for further analysis.

22.     At law enforcement direction, the CI was instructed to maintain contact with GARCIA in an attempt to arrange future purchases of firearms and narcotics. For numerous days prior to August 2, 2019, the CI exchanged several phone calls and text messages with GARCIA, to set up a purchase of

13

firearms and narcotics. Prior to the controlled buy, GARCIA instructed the CI to wire transfer $1000 to KENNEDY, as a down payment. On or about August 1, 2019, the CI texted and spoke with GARCIA, and confirmed the sale of firearms and methamphetamine.

23. The controlled purchase on or about August 2, 2019 was originally scheduled for on or about July 26, 2019. On or about July 25, 2016, law enforcement travelled down to the area of Greensboro, NC for the purpose of physically surveilling GARCIA. TARGET VEHICLE 1 and TARGET VEHICLE 2 were both located at the TARGET PREMISES. The following day law enforcement observed GARCIA operating TARGET VEHICLE 1. GARCIA was observed picking up a white female, matching the description of KENNEDY, and driving her to a Walmart store. During this time frame, GARCIA was communicating with the CI, in reference to picking up the cash advance. There was an error with the original wire transfer and GARCIA was unable to obtain the money. GARCIA advised the CI to fix the money issue before GARCIA travelled north for the controlled buy. Later that day, law enforcement agents were able to successfully wire transfer the aforementioned $1000.

24. On or about August 2, 2019, at the direction of ATF and the PWCPD, the CI conducted a controlled purchase of suspected

14

methamphetamine and firearms from GARCIA. I observed the phone associated with GARCIA travelling from the area of the TARGET PREMISES to the deal via pings coming from same, which indicated that this was GARCIA's route to the transaction with the CI. This controlled purchase took place in the parking lot of a Food Lion, located at 6358 Village Center Drive, Bealeton, Virginia 22712. Prior to the controlled purchase, the CI, as well as the vehicle in which the CI would travel, were searched for any illegal or unauthorized items. No illegal items were found. The CI was provided with a device, which collectively records and transmits audio, video and location information. GARCIA was observed by surveillance arriving on scene in TARGET VEHICLE 2. During the controlled purchase, the CI provided money directly to GARCIA as payment for the firearms and narcotics. GARCIA provided the CI with approximately 57 grams of suspected methamphetamine and 2 firearms. The firearms did not have serial numbers. The suspected methamphetamine provided by GARCIA field tested positive, and was submitted to the DEA LABORATORY for further analysis.

25.     At law enforcement direction, the CI was instructed to maintain contact with GARCIA in an attempt to arrange future purchases of firearms and narcotics. During the months of August 2019 and September 2019, the

15

CI and GARCIA exchanged several phone calls and text messages via the GARCIA TELEPHONE NUMBER to set up a purchase of a firearms and narcotics. A controlled purchase for firearms, cocaine, and methamphetamine had been tentatively arranged between GARCIA and the CI for the week of September 22, 2019.

26. During the month of September 2019, law enforcement obtained and executed GPS tracking search warrants on TARGET VEHICLE 1 and TARGET VEHICLE 2. Through monitoring of the aforementioned GPS trackers, law enforcement has observed that TARGET VEHICLE 1 and TARGET VEHICLE 2 are routinely parked at the TARGET PREMISES at various times throughout the day and overnight.

## USE OF CELLULAR TELEPHONES/STORAGE MEDIA BY DRUG AND GUN TRAFFICKERS

27. Based on my training, experience, and participation in narcotic, drug-related, and firearm-related investigations, and my knowledge of this case, I know that:

    a. It is common for individuals engaged in the distribution of controlled substances and/or firearms to use telephonic communications, both cellular (to include voice and text messages) and hard line, to further their criminal activities by

16

coordinating the distribution of narcotics, illegal proceeds of narcotics trafficking, and other efforts of co-conspirators;

b. Individuals engaging in the distribution of controlled substances and/or firearms use cellular telephones and cellular telephone technology to communicate and remain in constant contact with customers and the sources of those controlled substances;

c. Individuals who engage in the distribution of controlled substances and/or firearms use cellular telephones to exchange information with customers and/or source(s) of supply through text messaging and instant messaging in addition to direct telephone conversations. It is also common for narcotics traffickers to send photographs and videos as exchange of information with customers and/or source(s) of supply; and

d. Individuals who engage in the distribution of controlled substances and/or firearms frequently maintain information, personal records, photographs, and documents in an electronic format on computers and/or smart phones.

28. In my training and experience, it is likely that the TARGET PREMISES will contain at least one cellular phone because of the use of cellular phones in furtherance of the distribution of controlled substances

17

described above. Further, I know that GARCIA has used cellular phones to communicate about drug and gun transactions as described by CI, which has been corroborated by the search warrant that was obtained for location data and Pen Register Trap & Trace (PRTT) on the GARCIA TELEPHONE NUMBER.

29.     I know from my training and experience, as well as from information found in publicly available materials including those published by cellular phone providers, that some makes and models of cellular phones offer their users the ability to unlock the device via the use of a fingerprint or thumbprint (collectively, "fingerprint") in lieu of a numeric or alphanumeric passcode or password. This feature is called Touch ID.

30.     If a user enables Touch ID on a given cellular phone device, he or she can register fingerprints that can be used to unlock that device. The user can then use any of the registered fingerprints to unlock the device by pressing the relevant finger(s) to the device's Touch ID sensor. In my training and experience, users of cellular phone devices that offer Touch ID often enable it because it is considered to be a more convenient way to unlock the device than by entering a numeric or alphanumeric passcode or password, as well as a more secure way to protect the device's contents. This is particularly true when the user(s) of the device are engaged in criminal

18

activities and thus have a heightened concern about securing the contents of the device.

31.    In some circumstances, a fingerprint cannot be used to unlock a device that has Touch ID enabled, and a passcode or password must be used instead.  These circumstances include: (1) when more than 48 hours has passed since the last time the device was unlocked, and (2) when the device has not been unlocked via Touch ID in 8 hours and the passcode or password has not been entered in the last 6 days.  Thus, in the event law enforcement encounters a locked cellular phone device, the opportunity to unlock the device via Touch ID exists only for a short time.  Touch ID also will not work to unlock the device if (1) the device has been turned off or restarted; (2) the device has received a remote lock command; and (3) five unsuccessful attempts to unlock the device via Touch ID are made.

32.    The passcode or password that would unlock the cellular phone is not known to law enforcement.  Thus, it will likely be necessary to press the finger(s) of the user(s) of the cellular phone to the device's Touch ID sensor in an attempt to unlock the device for the purpose of executing the search authorized by this warrant.  Attempting to unlock the relevant cellular phone device(s) via Touch ID with the use of the fingerprints of the user(s) is necessary because the government may not otherwise be able to access the

data contained on those devices for the purpose of executing the search authorized by this warrant.

33. In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device. Thus, it will likely be necessary for law enforcement to have the ability to require FLAVIO LOPEZ GARCIA and BRIANNA CHANTEL KENNEDY of the TARGET PREMISES and/or TARGET VEHICLE 1 and TARGET VEHICLE 2 to press their finger(s) against the Touch ID sensor of the locked cellular phone device(s) found during the search of the TARGET PREMISES, and/or TARGET VEHICLE 1 and TARGET VEHICLE 2, in order to attempt to identify the device's user(s) and unlock the device(s) via Touch ID.

34. Although I do not know which of a given user's 10 fingerprints is capable of unlocking a particular device, based on my training and experience, I know that it is common for a user to unlock a Touch ID-enabled cellular phone device via the fingerprints on thumbs or index fingers. In the event that law enforcement is unable to unlock the cellular phone as described above within the attempts permitted by Touch ID, this will simply result in the device requiring the entry of a password or passcode before it can be unlocked.

20

35. Due to the foregoing, I request that the Court authorize law enforcement to press the fingers (including thumbs) of FLAVIO LOPEZ GARCIA and BRIANNA CHANTEL KENNEDY found at the TARGET PREMISES and/or TARGET VEHICLE 1 and TARGET VEHICLE 2 to the Touch ID sensor of cellular phones for the purpose of attempting to unlock the device via Touch ID in order to search the contents as authorized by this warrant.

36. After any cellular phones are seized from the TARGET PREMISES, TARGET VEHICLE 1 or TARGET VEHICLE 2, law enforcement will attempt to search them. If law enforcement cannot complete the search, then agents will send the phones to government laboratory or a private company that specializes in data extraction from electronics.

## TECHNICAL TERMS

37. Based on my training and experience, I use the following technical terms to convey the following meanings:

    a. *IP Address*: The Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address looks like a series of four numbers, each in the range 0-255, separated by periods (e.g.,

121.56.97.178). Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static— that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

b. *Internet*: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

c. *Storage medium*: A storage medium is any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

## COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

38. As described above and in Attachment B, this application seeks permission to search for records that might be found on the TARGET

PREMISES and/or in TARGET VEHICLE 1 and TARGET VEHICLE 2, in whatever form they are found. One form in which the records might be found is data stored on a computer's hard drive or other storage media. Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

39. *Probable cause.* I submit that if a computer or storage medium is found on the TARGET PREMISES and/or TARGET VEHICLE 1 and TARGET VEHICLE 2, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

    a. Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that

23

data remains on the storage medium until it is overwritten by new data.

b. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c. Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

24

d. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

40. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the TARGET PREMISES and/or TARGET VEHICLE 1 and TARGET VEHICLE 2 because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating

25

systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b. As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search

26

warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the

27

file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c. A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

28

d. The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

41. *Necessity of seizing or copying entire computers or storage media.* In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage

media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

a. The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

30

b. Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c. Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

42. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many

31

parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

## CONCLUSION

43.    Based on the foregoing facts, there is probable cause to believe that FLAVIO LOPEZ GARCIA distributed 5 grams or more of methamphetamine, its salts, isomers, and salts of its isomers, a Schedule II controlled substance, in violation of Title 21, United States Code, Section 841(a)(1), and possessed/carried and used a firearm in furtherance of/in relation to a drug trafficking crime, in violation of Title 18, United States Code, Section 924(c), within the Eastern District of Virginia, that he trafficked from the Middle District of North Carolina. In addition, there is probable cause to believe that items and records that are evidence of these violations are currently contained in the TARGET PREMISES, TARGET VEHICLE 1 and TARGET VEHICLE 2 located within the Middle District of North Carolina. I submit that this affidavit therefore supports probable cause for a warrant to search the TARGET PREMISES, TARGET VEHICLE 1 and TARGET VEHICLE 2 described in Attachment A and seize the items described in Attachment B.

32

Respectfully submitted,

Michael Jordan
Special Agent
Bureau of Alcohol, Tobacco,
Firearms, and Explosives

Subscribed and sworn to before me on September 25, 2019.

L. PATRICK AULD
United States Magistrate Judge
Middle District of North Carolina